Curtis PALMER, Plaintiff–Respondent,

v.

HOBART CORPORATION, Defendant–
Appellant/Cross–Respondent,

and

Donald O. Schnuck, d/b/a D & E
Leasing Company, Defendant–
Cross–Appellant.

Nos. 61622, 61623.

Missouri Court of Appeals,
Eastern District,
Division Two.

Feb. 2, 1993.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 17, 1993.

Application to Transfer Denied
April 20, 1993.

Russell F. Watters, Alexander G. Kolumbus, Brown & James, St. Louis, for Donald Schnuck, d/b/a D & E Leasing Co.

Eugene Buckley and John S. McCollough, Evans & Dixon, St. Louis, for Hobart Corp.

Michael A. Gross, Eugene H. Fahrenkrog, Jr., Walther/Glenn Law Associates, St. Louis, for Curtis Palmer.

CRANDALL, Presiding Judge.

Defendant, Hobart Corporation, appeals from the judgment, entered pursuant to a jury verdict, in favor of plaintiff, Curtis Palmer, on a strict liability failure to warn claim. Defendant, Donald O. Schnuck, d/b/a D & E Leasing Company, appeals from the judgment of the trial court in favor of Hobart Corporation on its cross-claim for attorney's fees, costs, and expenses incurred in defending the products liability action. We affirm in part and reverse and remand in part.

The evidence, viewed in the light most favorable to the verdict, established that plaintiff was a nineteen-year-old meat porter who worked part-time for Schnucks Markets, Inc. (Schnucks) at one of its stores. His duties included, but were not limited to, cleaning a Model 4152 meat grinder (grinder) which was manufactured by Hobart Corporation (Hobart). Donald O. Schnuck,

d/b/a D & E Leasing Company (D & E), purchased the grinder from Hobart and leased it to Schnucks. The grinder operated as follows: the operator dropped meat into a cylinder and a spiral-shaped augur moved the meat down the cylinder toward the chopping blades. The front of the grinding assembly was held in place by an adjusting ring. A guard, which prevented an operator's hand from getting down into the augur, was mounted on a large, flat meat pan. When the meat pan was attached to the grinder, the interlock switch was depressed and the grinder was able to operate. When the meat pan was removed, the interlock system prevented the grinder from operating. With electric power from the wall switch on, the grinder could be started by pressing either a foot pedal or a hand-operated start-stop button, provided the interlock switch was depressed.

To properly clean the grinder, it was necessary to disassemble it. Another meat porter employed by Schnucks instructed plaintiff about the proper way to dismantle and clean the grinder. At the time of the accident, plaintiff trained for about two weeks and had about three or four training sessions.

On September 13, 1986, when plaintiff began cleaning the grinder, he did not turn off the power to the grinder at the switch box on the wall. First, he removed the meat pan on which the guard was mounted and put it aside. The removal of the meat pan activated the interlock switch which prevented the machine from being turned on. Plaintiff took the adjusting ring off the front of the grinder and placed it on top of the grinder, where the interlock switch was located. The adjusting ring was heavy enough to depress the interlock switch. He then removed the plate and blade and put them into the meat pan. When he attempted to remove the augur from the cylinder of the grinder, he was unable to pull it out from the front of the grinder. He put his hand down the cylinder and pushed against the augur with the palm of his hand. At that point, plaintiff heard the motor turn over. He pushed the start-stop button on the machine and turned off the motor.

Plaintiff was unable to remove his hand from the grinder. When he cried for help, a meat cutter employed by Schnucks responded. The meat cutter reversed the augur and freed plaintiff's hand. Plaintiff ultimately lost the index and middle fingers of his right hand as well as the use of the rest of his hand. Plaintiff was right-handed.

Plaintiff brought the present action against Hobart and D & E. His first amended petition was in four counts: Count I was a strict liability product defect claim against Hobart and D & E; Count II was a negligent design claim against Hobart; Count III was a strict liability failure to warn claim against Hobart and D & E; and Count IV was a negligent failure to warn claim against Hobart and D & E. D & E filed a cross-claim against Hobart for indemnification. Prior to trial, the trial court granted D & E's motion for summary judgment on D & E's cross-claim for indemnification; but ordered that D & E's claim for attorney's fees, costs, and expenses be taken up after trial. The trial court also granted D & E's motion for summary judgment as to plaintiff's negligence claim. At trial, plaintiff dismissed his strict liability claims against D & E.

When the grinder was manufactured, Hobart placed a decal-type warning label on it which read:

WARNING: Do not operate the machine without the safety devices provided by Hobart:

 1. Guard over cylinder opening.

 2. Electric interlock under the pan.

At the time of the accident, the label was only partially attached to the grinder and the wording on it was difficult to read.

The jury returned a verdict against plaintiff and in favor of Hobart on the strict liability product design claim. The jury returned a verdict in favor of plaintiff and against Hobart on the strict liability failure to warn claim. On the negligence claim, the jury assessed Hobart's negligence at 39 percent and plaintiff's negligence at 61 percent. The jury assessed plaintiff's total damages, disregarding any fault on his

part, at $650,000. The trial court then granted Hobart's motion for judgment notwithstanding the verdict on the negligence claim, on the basis that the jury's finding for Hobart on the strict liability design defect claim precluded a finding that Hobart negligently designed the grinder. The court, however, denied Hobart's motion for judgment notwithstanding the verdict on the strict liability failure to warn claim and entered judgment against Hobart in the full amount of $650,000. The court also denied D & E's motion to enter judgment against Hobart on its cross-claim for indemnification of attorney's fees, costs, and expenses which it incurred in defending the products liability action.

## HOBART'S APPEAL

In its first point, Hobart contends that plaintiff failed to make a submissible case on the strict liability failure to warn claim. In reviewing a challenge to the submissibility of a case, the evidence is to be considered in the light most favorable to plaintiff, plaintiff is to receive the benefit of all inferences reasonably drawn from the evidence, and defendant's evidence that does not support plaintiff's case is to be disregarded. *Fahy v. Dresser industries, Inc.*, 740 S.W.2d 635, 638 (Mo. banc 1987).

Hobart's first challenge to the submissibility of plaintiff's failure to warn case is that plaintiff's own testimony about how the accident occurred was contrary to his theory of recovery. Hobart argues that Count I of plaintiff's amended petition alleged that he placed the adjusting ring on top of the grinder, which inadvertently depressed the interlock device, thereby overriding the interlock system; and that he unintentionally pressed the foot pedal which started the grinder. Hobart asserts that plaintiff's testimony contradicted these specific allegations.

On direct examination, in response to a question about where he placed the adjusting ring after removing it, plaintiff responded, "I put that into the meat [pan], as far as I remember." During cross-examination, defense counsel pursued the same

subject and the following colloquy occurred:

[Defense Counsel]: Now, on this day, September 13, 1986, you told us you took off the ring. Did you put that in the [meat pan]?

[Plaintiff]: As far as I can remember, yes.

[Defense Counsel]: That's your best recollection that you put it in the [meat pan]. Is that right?

[Plaintiff]: Yes.

[Defense Counsel]: That's what you have told everybody all along in this case, isn't it, that you took the ring off and put it in the [meat pan]?

[Plaintiff]: As far as I can remember, I put it in the [meat pan].

With regard to whether plaintiff made contact with the foot pedal, the following exchange took place:

[Defense Counsel]: How far away from the foot pedal was your foot as you were working with this auger and trying to push it out?

[Plaintiff]: To my best recollection, it was about a foot away.

[Defense Counsel]: About a foot. What you're telling us is then that on the day of the accident you did not have occasion to use the foot switch. Is that right?

[Plaintiff]: That's correct.

Hobart and plaintiff agree, as do their respective experts, that in order for the accident to occur, three things had to coincide: the power to the grinder had to be on at the wall switch; the interlock switch on the grinder had to be depressed; and pressure had to be applied to the foot pedal. There was evidence that the weight of the adjusting ring was sufficient to depress the interlock switch on top of the grinder.

Hobart posits that plaintiff's testimony was that he did not depress either the interlock switch or the foot pedal; and that this testimony must be regarded as false to support his theory of recovery. Hobart relies on the proposition that plaintiff's own contradictory testimony may be of such a character as to have the effect of a judicial admission. *See Elliott v. Wescoat*, 336 S.W.2d 649 (Mo.1960); *Hopkins v. Sef-*

*ton Fibre Can Co.,* 390 S.W.2d 907 (Mo. App.1965); *Mollman v. St. Louis Public Service Co.,* 192 S.W.2d 618 (Mo.App.1946).

In *Mollman,* plaintiff was injured when the taxicab in which she was riding was struck by a street car. *Mollman,* 192 S.W.2d at 620. Plaintiff named both the cab company and the public service company as defendants to the action. *Id.* Plaintiff's version of the accident contradicted the testimony of the street car motorman employed by the public service company, but was substantially corroborative of the testimony of the driver of taxicab. *Id.* at 621. The court held that plaintiff's own testimony established the cab company's freedom from the negligence charged against it and was conclusive as a judicial omission against her. *Id.* at 622. Her exoneration of the cab company, therefore, precluded her recovery from it. *Id.* The court stated:

> But if [a plaintiff] testifies positively and understandingly to the basic facts and circumstances in the case, and in the event his testimony would defeat his recovery, he makes no subsequent correction or modification under the claim of confusion or mistake, he may not have the benefit of the testimony of other witnesses which is contradictory of his own testimony with respect to the same matters. In other words, he cannot make out a better case for himself than he himself has testified to where his case involves facts within his own knowledge, for if this were to be allowed, it would be tantamount to permitting him to say for his own advantage that his own testimony should be regarded as false, and that of some other witness as true.

*Id.* at 621.

*Elliott* involved an intersectional collision. *Elliott,* 336 S.W.2d at 650. One theory under which plaintiff sought to recover against defendant was the law of "right of way," which provided that if two vehicles reached an intersection at approximately the same time, the vehicle approaching from the right had the right of way. *Id.* at 650–651. Plaintiff, however, testified unequivocally that after she stopped

and prior to starting forward, she looked to her left and saw defendant approaching the stop sign at decreasing speed and that he was 50 to 59 feet from the east edge of the intersection. *Id.* at 651. The court stated, "[I]n view of that positive testimony, plaintiff could not recover on the basic premise ... that both parties had reached the intersection at approximately the same time." *Id.* Plaintiff did not make a submissible case on the right of way theory when her own testimony was directly contrary to that theory. *Id.*

In *Hopkins,* plaintiff brought an action against defendant for injuries allegedly sustained when she fell over a lane divider in a parking lot. *Hopkins,* 390 S.W.2d at 908–909. Plaintiff submitted the case to the jury on the basis that the dividers on the parking lot created a hazardous condition to one walking on it at night because of inadequate lighting due to the non-functioning of two of the floodlights. *Id.* at 910. Defendant challenged the submissibility of plaintiff's case, claiming that there was no evidence that it had actual or constructive notice that the lights were out, a requisite element of plaintiff's negligence action. *Id.* Plaintiff's unequivocal and re-iterated testimony was that all the floodlights were burning on the night previous to her fall. *Id.* at 910–911. Because plaintiff's own testimony established that the non-functioning floodlights did not exist for a length of time sufficient to charge the defendant with constructive knowledge, she failed to make a submissible case on negligence. *Id.* at 911. The court stated, "[A] plaintiff is conclusively bound by his own testimony. And a plaintiff may not predicate a recovery upon a theory which is contrary to his own positive evidence." *Id.* at 910–911 (citations omitted).

 The instant action differs from the cases cited above in that plaintiff's testimony about how the accident occurred was equivocal. He qualified his statements about where he placed the adjusting ring and about whether he pressed the foot pedal with the phrases "[a]s far as I can remember" and "[t]o my best recollection." Plaintiff's statements were therefore not

definite and certain enough to be construed as judicial admissions.

In addition, this case is distinguishable from those cited above because there were not two possible explanations for the accident, one of which would defeat plaintiff's recovery. Here, the testimony of the parties' experts was consistent and established that there was only one way in which the accident could have occurred: the power had to be on at the wall switch; the interlock switch had to be depressed; and pressure had to be applied to the foot pedal. Plaintiff's testimony indicated that he did not recall either placing the adjusting ring on top of the grinder to depress the interlock switch or touching the floor pedal with his foot. The meat cutter who freed plaintiff's hand from the grinder, however, testified that when he arrived on the scene he saw the adjusting ring on top of the grinder. The meat cutter's testimony contradicted plaintiff's recollection of the events, and reflected plaintiff's confusion over how the accident happened. Plaintiff's reservations about how the accident happened did not establish an alternative way in which the accident could have occurred.

Lastly, this case does not represent a situation where, given that plaintiff was alone when the accident happened, there was a question as to whether the accident actually occurred. Plaintiff acknowledged that he was the only one who knew how the accident happened, but was unclear about what triggered it:

[Defense Counsel]: [A]t the time this ... occurred there was nobody else in this room?

[Plaintiff]: That's correct.

[Defense Counsel]: So, you're the only one who knows what happened?

[Plaintiff]: That's correct.

[Defense Counsel]: You don't remember Mr. Canterberry coming in afterwards and dismantling that cylinder and getting your hand out?

[Plaintiff]: No.

\* \* \* \* \* \*

[Defense Counsel]: Did you at that time have any explanation as to what caused the activation of this auger?

[Plaintiff]: As far as I knew, it seemed that it just turned on. I was pushing the auger and it turned over. It wasn't clear to me. I couldn't have given an explanation.

Here, it was obvious that the accident did in fact happen. Plaintiff was found by a Schnucks' meat cutter with his hand stuck in the grinder and he lost two fingers as a result. Plaintiff's testimony did not call into question the occurrence of the accident, but merely reflected a lapse in memory of the events surrounding the accident. His testimony, therefore, did not constitute a judicial admission which would defeat his recovery under a failure to warn theory.

Hobart's second challenge to the submissibility of plaintiff's failure to warn claim focuses on plaintiff's theory that the grinder had "no warning that the electric current should be disconnected prior to cleaning." Hobart argues that plaintiff was aware of the danger because the meat porter who trained plaintiff on the proper cleaning of the grinder instructed him to turn off the switch box before dismantling the grinder for cleaning.

■ A manufacturer has a duty to warn ultimate users when the product is inherently dangerous. *Duke v. Gulf & Western Mfg. Co.*, 660 S.W.2d 404, 418 (Mo.App.1983). The lack of an adequate warning in itself renders a product defective or unreasonably dangerous within the meaning of products liability law. *Id.* When the defense is raised that the injured plaintiff had adequate knowledge of the risks so as to obviate the duty to warn, the question of the adequacy of the knowledge is a question for the jury. *Id.* A general knowledge of the danger of machinery with moving parts or a general awareness that if part of the body were to become caught in the moving parts of the machinery it would cause injury is insufficient. *Id.*

■ The issue then is whether plaintiff knew of the danger of cleaning the grinder without switching off the power supply on the wall. With regard to this issue, we note that there is a distinction between instructions and warnings. *Nesselrode v.*

*Executive Beechcraft, Inc.*, 707 S.W.2d 371, 384 (Mo. banc 1986). "Warnings signal danger while instructions serve principally to provide the user with information necessary to make proper and efficient use of the product." *Id.* at 384–385.

Plaintiff testified that another meat porter instructed him verbally about cleaning the grinder and demonstrated how to dismantle the grinder. Plaintiff stated that during the training session, he observed the other meat porter turn off the power to the grinder at the wall switch. He also said that the meat porter cautioned him about the possibility of getting an electric shock from the wall switch because the floor around the grinder was usually wet. He testified that he thought that the grinder would not start unless the power was on at the wall switch, the start-stop button was pressed, and the foot pedal was depressed. He testified that he would not have put his hand into the cylinder of the grinder, had he been aware that there was any chance the augur would turn on.

In addition, plaintiff's expert testified that the warning label which Hobart affixed to the grinder was inadequate. The first problem with the decal-type label was its durability, especially when compared to the metal label which Hobart used to display its name on the grinder. At the time of the accident, the label on the grinder was partially missing and the wording on it was barely legible. The second problem with the label was the content of its warning. In the expert's opinion, given the severity of the hazards associated with cleaning the grinder, the label should have used the signal word "danger" instead of just "warning"; and should have apprised those persons cleaning the grinder of the danger of potential severe hand injury or amputation. Specifically, the label should have stated that the grinder should not be cleaned unless the electrical supply to the grinder was disconnected.

In the present action, there was evidence that plaintiff had no more than a general awareness of the danger of cleaning the grinder and had no knowledge of the specific danger of severe hand injury or amputation if the power source remained connected to the grinder. There was sufficient evidence for the jury to find that Hobart failed to provide an adequate warning to those persons cleaning the grinder.

■ Hobart's final challenge to the submissibility of plaintiff's case on a failure to warn theory concerns the element of proximate cause. Hobart posits that additional warnings would not have prevented plaintiff's injury, because plaintiff did not establish that if he had received an additional warning he would have altered his conduct.

Plaintiff testified, however, that in the past he heeded the warnings on other electrical machinery. He thought that when the power switch was on, the start button and the foot pedal had to be depressed to activate the grinder. He also specifically stated that he would not have put his hand into the grinder if he thought he could be injured. Plaintiff's evidence would permit the jury to conclude that he would have heeded an additional warning affixed to the grinder.

In conclusion, considering the evidence in the light most favorable. to plaintiff, plaintiff's own testimony about how the accident occurred was not of such a nature as to destroy the submissibility of his case. Plaintiff did not have knowledge of the specific danger of injury to him if he failed to disconnect the electric current from the grinder. The warning label affixed to the grinder was not adequate, because it failed to apprise plaintiff that the source of electricity to the grinder should be turned off prior to cleaning. Finally, had an additional warning been affixed to the grinder, plaintiff would have heeded it. Plaintiff, therefore, made a submissible case on his failure to warn claim. Hobart's first point is denied.

In its second point, Hobart contends that the jury's verdict in favor of Hobart on the strict liability product design defect claim was inconsistent with the jury's verdict in favor of plaintiff on the strict liability failure to warn claim. Hobart argues that the jury's determination that the grinder was not unreasonably dangerous during normal use concomitantly meant that the grinder

could not be unreasonably dangerous without a warning.

Instruction No. 6, patterned on MAI 25.04 [1978 Revised], was the verdict director for plaintiff's strict liability design defect claim:

### Instruction No. 6

Your verdict must be for plaintiff on the claim based on product design defect if you believe:

First, defendant sold the model 4152 meat chopper in the course of defendant's business, and

Second, the model 4152 meat chopper was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and

Third, the model 4152 meat chopper was used in a manner reasonably anticipated, and

Fourth, plaintiff was damaged as a direct result of such defective condition as existed when the Model 4152 meat chopper was sold,

unless you believe plaintiff is not entitled to recover by reason of Instruction Number 10.

Instruction No. 8, patterned on MAI 25.05 [1978 New], was the verdict director for plaintiff's strict liability failure to warn claim:

### Instruction No. 8

Your verdict must be for plaintiff on the claim based on product warning defect if you believe:

First, defendant sold the model 4152 meat chopper in the course of defendant's business, and

Second, the model 4152 meat chopper was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and

Third, defendant did not give an adequate warning of the danger, and

Fourth, the product was used in a manner reasonably anticipated, and

Fifth, plaintiff was damaged as a direct result of the model 4152 meat chopper being sold without an adequate warning, unless you believe plaintiff is not entitled to recover by reason of Instruction No. 10.

Hobart relies on the following language in *Nesselrode* to support its argument: "The determinative issue in a products liability failure to warn case is whether the information accompanying the product effectively communicates to the consumer or user the dangers that inhere in the product during normal use...." *Nesselrode*, 707 S.W.2d at 382.

*Nesselrode*, however, does not stand for the proposition which Hobart claims it does. Although the plaintiff in *Nesselrode* recovered both under a product design defect theory and under a failure to warn theory, the court never specifically held that a finding of a product defect was a necessary predicate to a failure to warn action. *Nesselrode* recognized that "a product may be rendered unreasonably dangerous and therefore actionable because the warning that has been given is informationally deficient." *Id.* Further, "[t]he lack of an adequate warning *in itself* renders a product defective or unreasonably dangerous within the meaning of product liability law." *Duke*, 660 S.W.2d at 418 (emphasis added).

▮ In addition, in interpreting verdicts, the court should look at the entire record to ascertain the jury's intent, and should construe the verdict liberally so that it may be given effect where possible. *White v. Otten*, 810 S.W.2d 704, 705 (Mo. App.1991). In the instant action, plaintiff submitted his case to the jury under two theories: under his product defect theory the jury was required to find that the grinder was "in a defective condition unreasonably dangerous when put to a reasonably anticipated use...."; under his failure to warn theory the jury was required to find that the grinder was "unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics...." These instructions permitted the jury to find that the grinder was not unreasonably dangerous when put to a reasonably anticipated use, but that the warning Hobart provided about the hazards associated with the grinder's reasonably anticipated use was inadequate. These two findings were not incompatible with each other. Hobart's second point is denied.

In its third point, Hobart alleges that the trial court erred in giving Instruction No. 8 because there was no evidence to support a finding that plaintiff was damaged as a result of Hobart's failure to provide an adequate warning on the grinder. This claim of error is similar to one raised under Point I and was adequately addressed under that point. Hobart's point is therefore denied pursuant to Rule 84.16(b).

■ In its final point, Hobart contends that the trial court erred in submitting plaintiff's damage instruction and verdict form. Hobart posits that the instruction and verdict form did not clearly communicate to the jury that plaintiff's recovery would be reduced by the percentage of fault attributable to him if, and only if, the jury found that plaintiff was entitled to recover under his negligence theory. Hobart argues that plaintiff's instruction and verdict form enabled the jury to believe that the judge would reduce *any* verdict in favor of plaintiff by the percentage of fault assessed against him. Hobart focuses on the following portion of the challenged instruction: "The judge will compute any recovery on plaintiff's claim for personal injury *based on negligence* by reducing the amount you find as plaintiff's total damages by any percentage of fault you assess to plaintiff." (Emphasis added). Hobart also points to the note contained in the verdict form: "NOTE: The judge will compute any recovery on plaintiff's claim for personal injury *based on negligence* by reducing the amount you find as plaintiff's total damages by any percentage of fault you assess to plaintiff." (Emphasis added).

Plaintiff's damage instruction and the verdict form both clearly indicated that the judge would adjust only a verdict based on negligence to reflect the percentage of fault which the jury attributed to plaintiff. Neither made any mention of a similar reduction of a verdict based on strict liability. We decline to speculate that the jury would have disregarded the clear language contained in both the instruction and the verdict form. Hobart's fourth point is denied.

## D & E'S APPEAL

In its appeal, D & E contends that the trial court erred in entering judgment in favor of Hobart on D & E's cross-claim for indemnification of attorney's fees, costs, and expenses. The facts pertinent to this claim of error are that plaintiff's claim against D & E in the underlying products liability action was based on the fact that D & E leased the grinder manufactured by Hobart to the Schnucks Market where the accident occurred. Plaintiff's petition did not allege that D & E altered the grinder in any way or engaged in any culpable conduct. D & E was merely a supplier in the chain of distribution. When plaintiff brought the products liability action against both D & E and Hobart, D & E tendered the defense to Hobart and Hobart refused the offer. D & E then filed a cross-claim against Hobart for indemnification of attorney's fees, costs, and expenses, totalling $27,190.99. These were expenses D & E incurred in defending the products liability action from the time Hobart refused to take over D & E's defense until the first day of trial when plaintiff dismissed the strict liability claim against D & E.

D & E sought summary judgment on its cross-claim for indemnification against Hobart on the products liability claim. The trial court severed the claim for indemnification of attorney's fees and ordered it to be taken up at a later date. The trial court subsequently granted D & E's motion for summary judgment on plaintiff's negligence claim. On the first day of trial, plaintiff dismissed without prejudice his claim against D & E for strict liability. After trial, the court denied D & E's motion to enter judgment against Hobart on D & E's cross-claim for attorney's fees, costs, and expenses.

■ Generally, Missouri law requires each litigant to pay his own attorney's fees unless otherwise provided by contract or statute. *Witt v. Austin*, 806 S.W.2d 63, 68 (Mo.App.1991). Under an implied indemnity contract, an indemnitee is entitled to recover from an indemnitor, as damages, attorney's fees expended in

defending against a suit from which the right of indemnity stemmed. *Hunter v. DeLuxe Drive–In Theaters,* 257 S.W.2d 255, 260–261 (Mo.App.1953). When an indemnity action arises from a products liability action, an indemnitee, the supplier of the defective product, is entitled to recover from an indemnitor, the manufacturer of the defective product, attorney's fees, costs, and expenses incurred in defending against strict liability and negligence claims which are advanced against the supplier simply because it stood in the stream of commerce between the manufacturer and the subsequent user of the defective product. *Hanover Ltd. v. Cessna Aircraft Co.,* 758 P.2d 443, 447 (Ut.App.1988). Reasonable attorney's fees, costs, and expenses are part of the damages sustained by the indemnitee in defending against a products liability action.

The right of the indemnitee to recover attorney's fees, costs, and expenses, however, is not absolute; but depends upon the existence of certain prerequisites. Attorney's fees, costs, and expenses are recoverable provided the indemnitee has given the indemnitor proper notice of the litigation and an adequate opportunity to undertake the defense. *See Ward v. City Nat'l Bank & Trust Co. of Kansas City,* 379 S.W.2d 614, 621 (Mo. 1964). In addition, another prerequisite to the recovery of attorney's fees, costs, and expenses is that the indemnitee has not defended against allegations of its own independent wrongful conduct. *Krug v. Sterling Drug, Inc.,* 416 S.W.2d 143, 156 (Mo.1967). Further, for the indemnitor to be liable to the indemnitee for attorney's fees, costs, and expenses, the liability of the indemnitor in the underlying products liability action must be established. *Hanover,* 758 P.2d at 448. It is immaterial whether a judgment has been entered against the indemnitee in the products liability action or whether it successfully defended itself. *Id.* at 450.

In summary, we permit a supplier who is in the stream of commerce to recover attorney's fees, costs, and expenses incurred in defending a products liability ac-

tion if the manufacturer is found liable of producing a defective product, if the supplier is free from culpability, and if the supplier gives the manufacturer notice of the claim and an opportunity to defend against it. We recognize that an innocent supplier who is defending against a products liability action should be able to recover attorney's fees, costs, and expenses which it incurred as a result of a manufacturer's placing a defective product in the stream of commerce. *See generally* Thomas R. Malia, *Attorney's Fees in Products Liability Suits,* 53 A.L.R.4th 414 (1987).

In the instant action, D & E was merely an innocent supplier in the chain of distribution. D & E leased the grinder to Schnucks. D & E did not alter the grinder which Hobart manufactured. Plaintiff did not make allegations in his petition concerning D & E's own wrongful conduct. After the underlying products liability action was filed, D & E tendered its defense to Hobart and Hobart refused the offer. D & E was not found liable in the products liability action. Hobart, however, was found liable and judgment was entered against it on plaintiff's strict liability failure to warn claim. D & E, therefore, was entitled to recover reasonable attorney's fees, costs, and expenses incurred in defending the underlying products liability action brought by plaintiff. The trial court erred in refusing to consider the merits of D & E's claim for indemnification and to determine the amount of attorney's fees, costs, and expenses for which Hobart is liable.

We affirm the judgment of the trial court in favor of plaintiff and against Hobart on plaintiff's strict liability failure to warn claim. We reverse the judgment of the trial court on D & E's indemnity claim against Hobart and remand the cause for the trial court to consider the merits of D & E's claim for attorney's fees, costs, and expenses incurred in defending the action.

PUDLOWSKI and GRIMM, JJ., concur.