Jeanne MOORE and Monty
Moore, Appellants,

v.

FORD MOTOR COMPANY,
Respondent.

No. SC 90681.

Supreme Court of Missouri,
En Banc.

Jan. 25, 2011.

Rehearing Denied March 29, 2011.

Randall L. Rhodes and Christopher J. Stucky, Douthit, Frets, Rouse, Gentile & Rhodes LLC, Kansas City, and Stanley J. Goodkin, Stanley J. Goodkin PC, Clayton, for Moores.

Dan H. Ball, Carole L. Iles, Stephen G. Strauss and Molly M. Jones, Bryan Cave LLP, St. Louis, for Ford.

Thomas E. Rice Jr., Angela M. Higgins and Bryan E. Mouber, Baker Sterchi Cowden & Rice LLC, Kansas City, and Hugh F. Young Jr., Reston, VA, for Product Liability Advisory Council Inc., which filed a brief as a friend of the Court.

LAURA DENVIR STITH, Judge.

Jeanne and Monty Moore appeal from the St. Louis County circuit court's judgment against them in their negligence and strict liability action against Ford Motor Company for paraplegia and other injuries that resulted when Ms. Moore's seat collapsed in a rear-end collision, causing her head to strike the back seat with severe force. At the close of the Moores' case-in-chief, the trial court granted a directed verdict in Ford's favor on the failure to warn claims. The jury found for Ford on the Moores' claim that the seats were defective and unreasonably dangerous because they were designed so that they were more likely to collapse in a rear-end collision when being used by an overweight person such as Ms. Moore.

This Court finds no error in the submission of the design defect claim and affirms the verdict for Ford on that cause of action. This Court agrees with the Moores, however, that the trial court erred in directing a verdict for Ford on the failure to warn claims. Contrary to the trial court's ruling, Missouri does recognize a failure to warn claim when the consumer shows she would not have purchased or would not have used an otherwise non-defective product that was rendered unreasonably dangerous because of the lack of adequate warning about the dangers the product posed to the class of users of which the plaintiff is a member. For these reasons, the judgment is affirmed in part and reversed in part, and the case is remanded.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

In April 2005, the Moores purchased a 2002 Ford Explorer. On November 1, 2005, the day of the collision, Ms. Moore was 6 feet tall and weighed approximately 300 pounds. She was stopped to make a left turn in the Explorer when she was hit from behind by another vehicle. At impact, the driver's seat collapsed backward and Ms. Moore's head and shoulders hit the back seat, fracturing her T9 vertebra. The injury rendered Ms. Moore a paraplegic.

Ms. Moore and her husband sued Ford under theories of negligent failure to warn, strict liability failure to warn, negligent design and strict liability design defect. The Moores' counsel explained their failure to warn claims during his opening statement as follows:

The third reason we've sued Ford arises from simple common sense. *Nowhere in the owner's manual or on the on-product labels did Ford tell people who might use the Explorer that it intended the front seats to collapse in a rear impact.* That's information we contend in this trial that people are entitled to know before they sit in those front seats. Just as important, I think, that's information we contend in this case that people are entitled to know before they put their children or loved ones behind these seats. None of that information was given to consumers by Ford. *If Jeanne and Monty would have been warned by*

---

1. The Court expresses its appreciation to the Honorable Paul C. Wilson for taking part in oral argument and for his contributions to resolution of this case while serving as a special judge of the Court until his term of office expired on December 31, 2010.

*Ford or instructed by Ford that the seats in the 2002 Explorer were intended to collapse in a rear impact, they may never have bought their car and we wouldn't be here* (emphasis added).

At trial, Ms. Moore testified that she paid attention to weight warnings when she purchased products because of her size and because her husband and son were both tall and heavy. Ms. Moore testified that she routinely read warnings, instructions and manuals if they involved something in which she was interested. Ms. Moore further testified that, after she purchased the vehicle but prior to the wreck, she looked through the owner's manual for information about other matters and, in doing so, saw no listing of maximum weight limits for the front seats. Ms. Moore also testified that she saw no warnings that the seats of the Explorer might collapse backward in a rear-end impact. In her words, she "figured that, you know, if you had that you would go forward." Ms. Moore further testified, without objection, that she would not have bought the Explorer had she known that the seats were not designed for people of her size. Ms. Moore then was asked whether she would have kept the Explorer if, after she bought the vehicle, she had found a warning in the owner's manual that the seats were not intended to protect people of her size. The court sustained Ford's objection that this testimony was speculative and lacked proper foundation. On cross-examination, Ms. Moore agreed that she had not been looking for seat weight limits specifically when she looked through the manual, that she had not checked her prior vehicles specifically for seat weight limits, and that she never saw seat weight limits listed in any of the vehicle manuals she had read.

Mr. Moore testified that his wife is the type of person who reads warnings and that he did not see any warnings or markings that the Explorer's seats were not designed for people of her size. Mr. Moore also testified, without objection, that had Ford provided some warning or indication that the seats in the Explorer were not designed for people of Ms. Moore's size, he would not have purchased the vehicle and would have done everything in his power to prevent his wife from riding in it.

At the close of the Moores' case, Ford moved for a directed verdict on all counts. In opposing this motion, the Moores further articulated why they had made a case on their failure to warn claims:

The subject Explorer is devoid of *any warning whatsoever* telling its customers like Jeanne that *the seat in the Explorer is dangerously susceptible to breaking and collapsing in a mild to moderate impact when holding an occupant of Mrs. Moore's size and weight, or that this condition leads to a loss of restraint that can allow an occupant to strike the rear seat causing spinal cord injuries and paralysis.*

(emphasis added).

The trial court granted the motion for directed verdict on the Moores' failure to warn claims. In its directed verdict motion, Ford argued that, under *Arnold v. Ingersoll–Rand Co.*, 834 S.W.2d 192, 193 (Mo. banc 1992), a failure to warn claim could not be based on a "time of purchase" theory that the consumer would not have purchased the product had a more adequate warning been given. The trial court accepted Ford's argument that consumers must show that the warning would have affected their conduct at the time of the accident or injury. Once the partial directed verdict was granted, the Moores then dismissed their negligent design claim, leaving only their claim for strict liability design defect to be submitted to

the jury. The jury returned a general verdict in favor of Ford. The Moores appealed. After opinion by the court of appeals, this Court accepted transfer. *Mo. Const. art. V, § 10.*

## II. STANDARD OF REVIEW

In reviewing the grant of a motion for directed verdict, this Court "must determine whether the plaintiff made a submissible case...." *Dunn v. Enterprise Rent–A–Car Co.,* 170 S.W.3d 1, 3 (Mo.App. 2005). "A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence." *Investors Title Co. v. Hammonds,* 217 S.W.3d 288, 299 (Mo. banc 2007). "An appellate court views the evidence in the light most favorable to the plaintiff to determine whether a submissible case was made...." *Tune v. Synergy Gas Corp.,* 883 S.W.2d 10, 13 (Mo. banc 1994). "The plaintiff may prove essential facts by circumstantial evidence as long as the facts proved and the conclusions to be drawn are of such a nature and are so related to each other that the conclusions may be fairly inferred." *Morrison v. St. Luke's Health Corp.,* 929 S.W.2d 898, 900 (Mo.App.1996). "Whether the plaintiff made a submissible case is a question of law subject to de novo review." *D.R. Sherry Const., Ltd. v. Am. Family Mut. Ins. Co.,* 316 S.W.3d 899, 905 (Mo. banc 2010). Further, with respect to evidentiary rulings, the trial court "enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal." *State v. Mayes,* 63 S.W.3d 615, 629 (Mo. banc 2001).

## III. THE TRIAL COURT ERRED IN DIRECTING A VERDICT ON THE FAILURE TO WARN CLAIMS

*A. Failure to Warn of Higher Risk when Seats Used by Overweight Persons.*

The Moores contend that they made a submissible case of strict liability for failure to warn in that the Explorer lacked any warnings that the front seats could collapse in rear impacts and were not tested or designed to perform with occupants of Ms. Moore's size.

The elements of a cause of action for strict liability failure to warn are: (1) the defendant sold the product in question in the course of its business; (2) the product was unreasonably dangerous at the time of sale when used as reasonably anticipated without knowledge of its characteristics; (3) the defendant did not give adequate warning of the danger; (4) the product was used in a reasonably anticipated manner; and (5) the plaintiff was damaged as a direct result of the product being sold without an adequate warning. *Tune,* 883 S.W.2d at 13.

In applying these elements, Missouri law recognizes that "a product may be rendered unreasonably dangerous and therefore actionable because of the absence of a warning concerning use or misuse, or because the warning that has been given is informationally deficient." *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 382 (Mo. banc 1986). "Under our model of strict tort liability the concept of unreasonable danger ... is presented to the jury as an ultimate issue without further definition." *Id.* at 378.

There is no dispute that the Moores presented substantial evidence with respect to the first and fourth elements in that (1) Ford stipulated that it designed, manufactured and sold the Explorer involved in this case, and (4) there is no dispute that by driving the car, Ms. Moore was using the Explorer in a reasonably anticipated manner at the time of the accident. There also is no dispute that no

warnings were given as to whether the seats were designed for a person of Ms. Moore's size or that they were designed to collapse backward in rear-impact collisions. Ford strongly disputes, however, that the Moores adduced sufficient evidence that the Explorer was unreasonably dangerous when used as reasonably anticipated without knowledge of its characteristics.

Ford argues that the only evidence the Moores cite as proof that the Explorer was unreasonably dangerous without a warning is the testimony from the Moores' experts that the vehicle was unreasonably dangerous because of its design. It therefore follows, Ford argues, that when the jury returned a verdict in Ford's favor on the Moores' design defect theory, it necessarily also rejected the Moores' only basis for claiming that the vehicle was unreasonably dangerous without a warning of its characteristics.

■■ Ford's argument is misplaced. It assumes that a product cannot be unreasonably dangerous, even if it has no warnings of dangers associated with its use, so long as the product's design itself is not defective. But this Court has "never specifically held that a finding of a product defect was a necessary predicate to a failure to warn action." *Palmer v. Hobart,* 849 S.W.2d 135, 142 (Mo.App.1993). This is because design defect and failure to warn theories constitute distinct theories aimed at protecting consumers from dangers that arise in different ways.

For example, design defect theories address the situation in which a design is itself inadequate, rendering the product unreasonably dangerous without regard to whether a warning is given—such as a lawn mower designed without a guard or deflector plate. *See, e.g., Keller v. Int'l Harvester Corp.,* 648 S.W.2d 584, 586 (Mo. App.1983).

■■ But many products that otherwise might be dangerous can be used safely if adequate instructions for use are given and if warnings of dangers are adequate. Failure to warn claims are concerned with how a lack of warning about a product, and the user's resultant lack of knowledge about the product's dangers or safe use, may give rise to an unreasonable danger to the consumer. In such a case, it would not be inconsistent for a jury to find that a product's design is not unreasonably dangerous in itself but that, without an accompanying warning imparting knowledge of the product's dangerous characteristics or safe use, the *otherwise* non-defective product is unreasonably dangerous.

■■ As various decisions of the Missouri court of appeals have explained this distinction between design defect and failure to warn theories, "[e]ven though a product may be designed and manufactured properly, the lack of an adequate warning, in itself, may render a product defective or unreasonably dangerous within the meaning of the law." *Brown v. Bay State Abrasives,* 821 S.W.2d 531, 533 (Mo. App.1991); *accord Duke v. Gulf & W. Mfg. Co.,* 660 S.W.2d 404, 418 (Mo.App.1983) (a "lack of an adequate warning in itself renders a product defective or unreasonably dangerous within the meaning of product liability law").

The facts of *Palmer* well-illustrate this distinction. Palmer, a part-time worker at a grocery store, sued the defendant manufacturer for strict liability design defect and failure to warn after his hand became lodged in the manufacturer's meat grinder. 849 S.W.2d at 136–37. As in this case, Palmer submitted the standard MAI jury instructions for design defect patterned on MAI 25.04; Palmer also was permitted to submit a claim of failure to warn patterned on M.A.I. 25.05. *Id.* at 142. The jury

returned a verdict in favor of the manufacturer on the design defect claim but in favor of Palmer on the failure to warn claim. *Id.* at 137.

The court rejected the manufacturer's argument that "the jury's determination that the grinder was not unreasonably dangerous during normal use concomitantly meant that the grinder could not be unreasonably dangerous without a warning." *Id.* at 141–42. The court held there was no inconsistency in the two verdicts. Palmer had argued that the design allowed him to put his hand in the grinder and that it should not have done so; he also argued that the warnings given about the risks of putting his hand in the grinder were inadequate to convey the need to disconnect the power and the severity of the danger should he fail to do so. On these facts, the instructions properly "permitted the jury to find that the grinder was not unreasonably dangerous when put to a reasonably anticipated use, but that the warning [defendant] provided about the hazards associated with the grinder's reasonably anticipated use was inadequate. These two findings were not incompatible with each other." *Id.* at 142.

*Dunne v. Wal–Mart Stores, Inc.,* 679 So.2d 1034 (La.Ct.App.1996), applies this same reasoning to a claim that an exercise bike was unreasonably dangerous because of a failure to warn that it only was intended to support persons up to 250 pounds. Ms. Dunne weighed approximately 500 pounds. When she used the bike in an attempt to exercise, it collapsed, causing her severe injury. *Id.* at 1036. Although there was no claim that the bike was designed defectively or did not operate as intended, *Dunne* held that the failure of the manufacturer to warn that the bike should not be used by persons weighing over 250 pounds "rendered the product

unreasonably dangerous, causing plaintiff's accident and injuries." *Id.* at 1038.

The application to this case of the principles set out in *Palmer* and *Dunne* is evident. Viewing the evidence in the light most favorable to the Moores and drawing all inferences in their favor, they adduced sufficient evidence for the jury to find that the Explorer was unreasonably dangerous without a warning imparting knowledge of its characteristics despite the finding that the design of the seats themselves was not defective. Louis D'Aulerio, one of the Moores' experts, testified that pull testing he conducted showed that the point of failure for a 2002 Explorer seat is 16,870 inch pounds. Mr. D'Aulerio then calculated the forces that were generated on Ms. Moore's seat in the wreck given the change in velocity, sustained "g-forces" and her weight. Mr. D'Aulerio testified that although the change in velocity for the collision was as low as 12.8 miles per hour, due to Ms. Moore's weight and other calculations, the Explorer seat endured forces of 15,800 to 19,000 inch pounds. Mr. D'Aulerio testified that this calculation showed that, in rear-end collisions at mild to moderate speeds—12.8 to 17.2 miles per hour change in velocity—given Ms. Moore's weight, the forces in the crash exceeded the seat's capability. The jury was entitled to consider whether the Explorer seat was rendered unreasonably dangerous when not accompanied with a warning of its greater potential to collapse under the circumstances of a low to moderate rear-end collision while carrying a person of Ms. Moore's weight.

Ford argues that the type of danger presented by its seats is not amenable to a simple warning because the seat is safe for use by people of Ms. Moore's weight in normal driving conditions and in most accidents, other designs present other dangers, and the risk of danger varies with

the type and speed of accident. Ford argues that because the Moores never state precisely what an appropriate warning would have said, such a warning could not realistically be made; the Moores, therefore, failed to make their case of failure to warn. This Court disagrees.

 Ford does not cite any Missouri law placing the burden on the plaintiff to propose the wording of an adequate warning to make a submissible case.[2] While both Ford and the dissenting opinion note that Indiana apparently does place this burden on plaintiff, Indiana appears to be unique in this regard. Numerous jurisdictions follow the heeding presumption in failure to warn cases, not just Missouri and Indiana,[3] and no other state has been iden-

---

**2.** Of course, prudence and good lawyering may dictate that a plaintiff do so. In their response to Ford's motion for directed verdict, the Moores did explain the basic structure of what they believed to be an adequate warning. The Moores argued that Ford should have told "its customers ... that the seat in the Explorer is dangerously susceptible to breaking and collapsing in a mild to moderate impact when holding an occupant of Ms. Moore's size and weight, or that this condition leads to a loss of restraint that can allow an occupant to strike the rear seat causing spinal cord injuries and paralysis."

**3.** *See, e.g., Bushong v. Garman Co.*, 311 Ark. 228, 843 S.W.2d 807, 811 (1992) ("Once a plaintiff proves the lack of an adequate warning or instruction, a presumption arises that the user would have read and heeded adequate warnings or instructions"); *Payne v. Soft Sheen Products, Inc.*, 486 A.2d 712, 725 (D.C.1985) (adopting "a rebuttable presumption in cases of this type that the user would have read an adequate warning, and that in the absence of evidence rebutting the presumption, a jury may find that the defendant's product was the producing cause of the plaintiff's injury"); *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 681 P.2d 1038, 1057–58 (1984) ("In this case, the warning was inadequate. On the evidence before it, the jury was entitled to find that this inadequate warning caused Mrs. Wooderson's injuries"); *Bloxom v. Bloxom*, 512 So.2d 839, 850 (La.1987) ("Once a plaintiff proves that the lack of an adequate warning or instruction rendered the product unreasonably dangerous, his cause in fact burden is assisted by a presumption: when a manufacturer fails to give adequate warnings or instructions, a presumption arises that the user would have read and heeded such admonitions"); *Eagle–Picher Industries, Inc. v. Balbos*, 326 Md. 179, 604 A.2d 445, 468–69 (1992) ("The Maryland 'presumption' at a minimum means that jurors are entitled to bring to their deliberations their knowledge of the 'natural instinct' and 'disposition' of persons to guard themselves against danger"); *Wolfe v. Ford Motor Co.*, 6 Mass.App.Ct. 346, 376 N.E.2d 143, 147 (1978) ("The failure to give such a warning therefore permits the inference that it would have alerted the user to the danger and forestalled the accident. The jury were free to draw such an inference absent some negating evidence binding on the plaintiffs"); *Coffman v. Keene Corp.*, 133 N.J. 581, 628 A.2d 710, 720 (1993) ("the plaintiff should be afforded the use of the presumption that he or she would have followed an adequate warning had one been provided, and that the defendant in order to rebut that presumption must produce evidence that such a warning would not have been heeded"); *Butz v. Werner*, 438 N.W.2d 509, 517 (N.D.1989) ("We conclude that when no warning is given the plaintiff is entitled to the benefit of a presumption that an adequate warning, if given, would have been read and heeded"); *Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 423 N.E.2d 831, 838 (1981) ("where no warning is given, or where an inadequate warning is given, a rebuttable presumption arises, beneficial to the plaintiff, that the failure to adequately warn was a proximate cause of the plaintiff's ingestion of the drug"); *Cunningham v. Charles Pfizer & Co.*, 532 P.2d 1377, 1382 (Okla.1974) ("we conclude plaintiff was not required to present any direct evidence upon this point because he was entitled to a rebuttable presumption he would have heeded any warning which might have been given"); *Howard v. Faberge, Inc.*, 679 S.W.2d 644, 650 (Tex.App. 1984) ("The appellant also contends that the trial court erred in refusing to instruct the jury that they should presume that the appellant would have read and heeded a proper warning had one been given. It is well established that such a presumption exists, where the product has no warning"); *Menard v.*

tified that requires proof of the specific language of an adequate warning as an element of plaintiff's claim. Indeed, Washington specifically provides that the plaintiff in a failure to warn case need *not* "prove the exact wording of an adequate warning." *Ayers v. Johnson & Johnson Baby Products Co.,* 59 Wash.App. 287, 797 P.2d 527, 531 (1990). The other cases cited by the dissent do not concern whether a plaintiff must propose specific alternative language for a warning, much less require plaintiff to do so, but rather discuss generally the types of issues that may be relevant in a failure to warn case, including the feasibility of giving a warning about the danger at issue.[4] Missouri does not require a plaintiff to create an alternative design to prove a design defect claim;

it is enough that plaintiff show that the design used was defective and unreasonably dangerous. *Smith v. Brown & Williamson Tobacco Corp.,* 275 S.W.3d 748, 794 (Mo.App.2008) (plaintiff need not show what alternative design should be although defendant can show difficulties with alternative designs in defense). This Court rejects the suggestion that this concededly new element must be added to those required already under Missouri law to prove failure to warn.[5]

The broad principles the dissent cites concerning relevance and feasibility do not address Ford's real difficulty here, which seems to be in how to phrase its warning. But Ford has not cited any authority that the difficulty of phrasing an adequate warning excuses the failure to give any

---

*Newhall,* 135 Vt. 53, 373 A.2d 505, 506 (1977) ("a presumption is created that the [plaintiff] would have read the warning and heeded it. In effect, a presumption of causation is created in failure-to-warn cases").

4. *Pelman v. McDonald's Corp.,* 237 F.Supp.2d 512, 540 (S.D.N.Y.2003), in discussing the lack of a need to warn of the obvious dangers of fatty foods, simply said that the standard for failure to warn liability "is intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances . . .; obviousness of the risk from actual use of the product; knowledge of the particular product user, and proximate cause." *Id.* at 540. The other citations also discuss either feasibility or the need to identify the danger about which a warning is needed; none require a plaintiff to bless particular alternative language to make a submissible case. *See, e.g., Downing v. Overhead Door Corp.,* 707 P.2d 1027, 1033 (Colo.App.1985) (pre-accident remedial measures are "admissible to demonstrate a defendant's preexisting knowledge of the danger inherent in the product, the feasibility of giving a warning, and the existence of a duty to warn users of the defect"); *Oxford v. Foster Wheeler LLC,* 177 Cal.App.4th 700, 99 Cal.Rptr.3d 418, 433 (2009) (generally noting: "Whether the absence of a warning makes a product defective involves several factors, in-

cluding a consumer's normal expectations of how a product will perform, degrees of simplicity or complication in its operation or use; the nature and magnitude of the danger to which the user is exposed, the likelihood of injury; and the feasibility and beneficial effect of a warning. . . . In general, the adequacy of the warning is a question for the jury"); *Coleman v. Chesebro–Whitman Co.,* 262 A.D.2d 265, 690 N.Y.S.2d 729, 729 (1999) (giving no facts but saying that plaintiff needed to allege what labels on ladder would have warned about and how the lack of the warning was a proximate cause of the injury); *Meyerhoff v. Michelin Tire Corp.,* 852 F.Supp. 933, 947–48 (D.Kan.1994) (plaintiff failed to make case when experts testified that the colorful warning and detailed language plaintiff said had to be placed on tire itself could not feasibly be placed there).

5. In Missouri, as noted earlier, those elements are proof that (1) the defendant sold the product in question in the course of its business; (2) the product was unreasonably dangerous at the time of sale when used as reasonably anticipated without knowledge of its characteristics; (3) the defendant did not give adequate warning of the danger; (4) the product was used in a reasonably anticipated manner; and (5) the plaintiff was damaged as a direct result of the product being sold without an adequate warning. *Tune,* 883 S.W.2d at 13.

warning. While the warning alleged to be needed here may take some thought to construct, in the absence of a showing that giving a warning simply would not be technically feasible, any remaining difficulty Ford might have in formulating the precise wording to use in the warning does not negate its need to warn but rather emphasizes the need to do so carefully.[6]

The Moores also argue that a warning should have been given about what testing Ford did on its seats and that it should have warned that it did not specifically test the seats with dummies weighing more than 225 lbs. But no case has been cited stating that an adequate warning must inform the consumer of all tests done on all parts of a vehicle. Such a listing more likely would confuse rather than serve the purpose of warnings, which is to impart instructions for use and information about risks that allow the consumer to make an informed decision about how to use the product. *Bay State Abrasives*, 821 S.W.2d at 533 ("risk reduction" is the intended function of product warnings). Here, the Moores claim the warning should have told them that the seats were more likely to collapse in certain rear-end collisions if the person in the seat weighed more than 225 pounds. Ford did not contest the fact that, based on its testing, it knew such collapse was more likely. What tests Ford may or may not have run to acquire the knowledge it admittedly already had simply would not have provided an alternative theory of recovery here.[7]

*B. Proof the Lack of Warning Caused the Injuries.*

Ford alternatively argues that the Moores did not provide substantial evidence that Ms. Moore was damaged as a direct result of the product being sold without an adequate warning. There are two aspects of proving causation in a failure to warn case. First, of course, the plaintiff must show causation in fact by showing that the product for which there was no warning caused the injuries. Here, there is no question that the seats did collapse and that Ms. Moore received her injuries in the accident. Experts for the Moores testified that those injuries were caused by the collapsing seats, while Ford presented contrary evidence. The evi-

---

6. Moreover, this Court's holding will not lead to a requirement that Ford must provide detailed warnings about how each part of the car will behave for persons of all different weights, sizes and shapes. The Court holds only that where, as here, the evidence shows that Ford knew its design meant that its seats were more likely to collapse backward in rear-end collisions when used by persons of more than normal weight, subjecting them to the risk of serious injuries such as those sustained by Ms. Moore, a jury could find that it had a duty to warn the consumer of that increased risk so the consumer could make an informed choice whether to use the seats despite that danger. Only if a comparable showing were made that other features rendered the product unreasonably dangerous in the absence of an adequate warning would a failure to warn claim be submissible as to other features of a vehicle, as that is the standard for recovery under Missouri law.

7. This Court is not holding that a failure to test potentially would not be an available aspect of a failure to warn or design defect claim if, for example, the evidence showed that the manufacturer was unaware of the dangers its products posed to pregnant women, infants and so forth and failed to inform the consumer that such tests had not been performed. In such a case, the allegation would be negligence in failing to investigate whether the product is safe for use and the resultant inability to give sufficient information about safe use to the consumer. Here, Ford does not deny it knew through its tests that the seats might collapse backward for persons of certain weights in certain accidents. It simply claimed that its design was safer than having rigid seats, which it said would be more likely to cause injuries in other scenarios.

dence clearly presented a jury question whether the collapse of the seats caused Ms. Moore's injuries.

■■■■■ Second, the plaintiff must show proximate cause. To do this, "plaintiffs must show that a warning would have altered the behavior of the individuals involved in the accident." *Arnold,* 834 S.W.2d at 194; *accord Tune,* 883 S.W.2d at 14. To satisfy this burden, "Missouri, like several other states, aids plaintiffs in proving this second part of causation by presuming that a warning will be heeded." *Arnold,* 834 S.W.2d at 194. But the "presumption that plaintiffs will heed a warning assumes that a reasonable person will act appropriately if given adequate information. Thus, a preliminary inquiry before applying the presumption is whether adequate information is available *absent* a warning." *Id.* Moreover, "[a]s causation is a required element of the plaintiffs' case, the burden is on plaintiffs to show that lack of [prior] knowledge." *Id.* "Numerous cases have held that when the defense is raised that the injured plaintiff had adequate knowledge of the risks so as to obviate the duty to warn, the question of the adequacy of the knowledge is a question for the jury." *Duke,* 660 S.W.2d at 418.

Here, Ford does not claim that either of the Moores knew at the time they purchased or used the Ford Explorer that the seats were designed to collapse backward in certain rear-end collisions or that Ms. Moore was at greater risk of injury in such a collision as a result. Accordingly, that part of the causation test is not at issue here.

■■■■■ "If there is sufficient evidence from which a jury could find that the plaintiff did not already know the danger, there is a presumption that a warning will be heeded." *Tune,* 883 S.W.2d at 14. "[T]he term 'presumption' is used to mean

'makes a prima facie case,' i.e., creates a submissible case that the warning would have been heeded." *Id.* Such a presumption would make a prima facie case that had Ford given the Moores an adequate warning, the Moores would have heeded it.

Ford nonetheless argues that the Moores' testimony about what Ms. Moore would have done had warnings been given was speculative. In support, they cite to *Arnold v. Ingersoll–Rand Co.,* 908 S.W.2d 757 (Mo.App.1995) (*Arnold II* ), in which the plaintiff was prohibited from testifying that he would have taken greater precautions against an explosion had he received a more adequate warning of the risk of explosion because "[t]estimony about what a plaintiff might have done under a hypothetical state of facts is speculative and immaterial." *Id.* at 763. In this case, Ford objected to the Moores' attempts to admit evidence of what they would have done had they received an adequate warning, arguing that such testimony simply constituted speculation about what they would have done in a hypothetical situation. The trial court sustained a number of these objections. The Moores contend this was error.

■■■■ Ford is correct that where, as here, no warning is given, then evidence of what a person would have done had a warning been given inherently is hypothetical in character. Yet, to show causation, a plaintiff must show that the absence of a warning was the proximate cause of the injury. As a matter of logic, to accomplish this a plaintiff must show that she did not have the information the warning would have imparted already and that, if she had the information, it would have affected her conduct. This creates a "Catch–22" in which the plaintiff must prove what she would have done had a warning been given

to prove causation, but evidence on this issue must be precluded as speculative.

This dilemma is avoided in Missouri and other states by the use of a presumption that had an adequate warning been given, it would have been heeded. For that reason, the trial court did not err in holding during the direct examination of Ms. Moore that her testimony as to what she might have done had a warning been given was speculative. *Arnold,* 908 S.W.2d at 763.

The heeding presumption is a rebuttable one, however. *Tune,* 883 S.W.2d at 14. Here, Ford chose to try to rebut it by obtaining concessions from Ms. Moore on cross-examination that she really did not look for warnings and that she would have driven the vehicle once purchased. She agreed that she did not look specifically at this manual or at prior vehicle manuals with the purpose of seeing whether there was a seat weight limit.

The Moores did not attempt to question Ms. Moore further about whether she would have looked for or heeded the warning on redirect, after such evidence became relevant once Ford tried to rebut the presumption.[8] Nonetheless, earlier portions of her testimony that did come in without objection, set out at length above, supported the Moores' position that she would have heeded a warning about the risks the seats posed for persons of greater than normal weight.[9] It would be up to

a jury to weigh all of this testimony. A jury may find persuasive the implication from Ford's questions that the Moores' testimony was self-serving and should not be accorded much weight. But a jury instead might find it entirely credible. Such a credibility determination is for the jury.

Finally, Ford argues that the presumption or evidence that a warning would have been heeded has no relevance or application where, as here, the only way to heed the warning is not to buy or use the product. In such a case, Ford argues, the claim is not really a failure to warn claim but an improper marketing claim. In support, Ford cites the first decision in *Arnold,* 834 S.W.2d at 194, which it says held that allegations of failure to warn at the "time of purchase" are so remote and speculative that as a matter of law they cannot support a failure to warn claim. Ford's reading of *Arnold* is overbroad.

In *Arnold,* the plaintiff, an automobile repair shop worker, sued the defendant in strict liability failure to warn when the defendant's air compressor ignited gasoline fumes that were not properly ventilated, resulting in injury to the plaintiff. 834 S.W.2d at 192–93. Mr. Arnold argued that had the manufacturer warned that the air compressor was not airtight, the third-party supplier would not have sold the air compressor to the plaintiff's employer, the

---

8. Should Ford indicate it intends to do so again on remand, it would be error not to allow the Moores to respond with evidence supporting their claim that they would have heeded the warning if given.

9. More specifically, Ms. Moore said she thought the seats would go forward, not backward; that she routinely read warnings, instructions and manuals when they involved something in which she was interested: and that she paid attention to weight warnings because she, her husband and her son all

were both tall and heavy. Ms. Moore further testified that, after she purchased the vehicle but prior to the wreck, she looked through the owner's manual for information about towing weight limits and other matters and did not see any maximum weight limits for the front seats, although she looked in the very section where they would have been located. Ms. Moore further testified, without objection, that she would not have bought the Explorer had she known that the seats were not designed for people of her size.

automobile repair shop, and, therefore, Mr. Arnold would not have been using it. *Id.* at 193. Neither the supplier nor the repair shop was a party to the lawsuit.

*Arnold* did hold that what the parties refer to as this "time of purchase" theory of failure to warn was too speculative to support submission. But it did so because the theory depended on the jury deciding what a third party—the shop owner—would have done had a warning been given. As *Arnold* noted, such a piling of inference upon inference as to what persons in the chain of supply would have done ignores "any reasonable concept of proximate cause." *Id.* But, while *Arnold* noted that "the traditional approach to proximate cause in failure to warn cases focuses on the effect of giving a warning on the actual circumstances surrounding the accident," *id.*, it did not purport to bar failure to warn claims involving a direct purchase by a plaintiff, and any such statement would have been dicta in any event.

Where, as here, the evidence is sufficient to show that the product was unreasonably dangerous for use by the plaintiff without the additional warning and that had the warning been given at the time of purchase or before use on the day of the accident, it would have been heeded, a submissible case is made.

As noted earlier, not only did the Moores testify that they did not know the Explorer seats yielded rearward for persons of Ms. Moore's weight much more readily than for persons of normal weight, they went further by presenting evidence that had they read a warning before purchase, they would not have purchased the Explorer, and had they learned of it later through reading the manual, Mr. Moore would have done everything in his power to prevent his wife from riding in the Explorer. This causation theory is straightforward, not speculative, and does not offend reasonable concepts of proximate cause.

### C. The Moores Made a Submissible Case of Negligent Failure to Warn.

 The Moores also contend that they made a submissible failure to warn claim under a negligence theory. "Although negligence and strict liability theories are separate and distinct, the same operative facts may support recovery under either theory, particularly in a failure to warn case." *Hill v. Air Shields, Inc.,* 721 S.W.2d 112, 118 (Mo.App.1986). A failure to warn claim sounding in negligence focuses on what the manufacturer knew rather than on the product. The elements of a claim for failure to warn based in negligence are: (1) the defendant designed the product at issue; (2) the product did not contain an adequate warning of the alleged defect or hazard; (3) the defendant failed to use ordinary care to warn of the risk of harm from the alleged defect or hazard; and (4) as a direct result of the defendant's failure to adequately warn, the plaintiff sustained damage. *MAI 25.09.*

As to the first element, Ford stipulated that it designed, manufactured and sold the Explorer involved in this case. With respect to whether the Explorer contained an adequate warning of the alleged hazard, the Moores' testimony established that the Explorer lacked any warnings as to whether the seats were designed for a person of Ms. Moore's weight or that they were designed to collapse backward in rear-end impact collisions. With respect to whether the Moores produced evidence that they sustained damage as a direct result of Ford's failure to warn adequately, "the causation elements are the same for both strict liability and negligent failure to warn." *Smith v. Brown & Williamson Tobacco Corp.,* 275 S.W.3d 748, 788 n. 107

(Mo.App.2008). For the reasons noted above, the Moores made a submissible case of causation.

■ The critical issue, then, was whether Ford failed to use ordinary care to warn of harm from the alleged defect in the Explorer.[10] There was sufficient evidence for this question to go to the jury. That someone weighing as much as Ms. Moore would be driving the vehicle was foreseeable; Ford admitted it was predictable that persons weighing more than 220 pounds would use its vehicles. It was also foreseeable that the seats would yield in a rearward manner; one of Ford's experts testified that the Explorer's seats are designed to yield rearward and that the seat in which Ms. Moore was sitting during the crash performed as expected by Ford. The Moores' expert, Mr. D'Aulerio, testified that Ford's design of the Explorer's seat was negligent because it was not capable of remaining upright in a rear-end crash. Based on this evidence, the Moores made a submissible case that the Explorer posed potential dangers and that Ford was negligent in failing to warn of them.

## IV. LIMITATION OF THE SCOPE OF DR. SMITH'S CROSS–EXAMINATION

The Moores claim that the trial court erroneously restricted their cross-examination of Ford's expert, Dr. Harry Smith. Their counsel asked Dr. Smith on cross-examination about a statement by the Moores' vehicle design expert, Dr. Wayne Ross: "Dr. Ross has told us that the risk of injuries in rear impacts can be ameliorated or made better by bracing or maintaining the head and neck. Do you agree with that statement?" The court sustained Ford's objection to this question on the basis that it went beyond the subject

of the direct examination of Dr. Smith, who testified about the mechanism of Ms. Moores' injuries based on her radiology scans.

■ The Moores are correct that the trial court gave the wrong reason for its ruling. Missouri follows the rule that if "a witness is sworn and gives 'some evidence,' however formal or unimportant, the witness may be cross-examined as to all matters in the case." *State v. Gardner*, 8 S.W.3d 66, 71 (Mo. banc 1999); *see also* § 491.070 ("A party to a cause, civil or criminal, against whom a witness has been called and given some evidence, shall be entitled to cross-examine said witness … on the entire case"). But the Moores have not shown that exclusion of this single answer resulted in prejudicial error.

■ Most basically, the Moores' offer of proof is inadequate to have preserved this issue. Their counsel made a narrative offer of proof, stating:

Your Honor, I'd like to just make a brief offer of proof about the issue of Dr. Smith's testimony regarding Dr. Ross. On direct examination Dr. Smith made extensive comment on his review of Dr. Ross' testimony. And the question that I was asking and Mr. Strauss objected to and your Honor sustained pertained to Dr. Smith's evaluation of Dr. Ross' opinion regarding maintaining head and neck complex in a rear-impact collision and whether or not Dr. Smith agreed with Dr. Ross that it would ameliorate or make better injuries regarding—in rear impact collision when you maintain the head and neck complex. And then one step further, whether he was going to agree with the forces that the human body can withstand when that was done

---

10. The jury's general verdict in favor of Ford was based only on Ford's design defect claim.

The Moores dismissed their negligent design claim prior to submission.

in the range or 28 to 42 Gs. The paper that doctor identified as Plaintiff's Exhibit 119 contains a statement that supports that issue. So we would make an offer of proof of Plaintiff's Exhibit 119 where the issue of confirming that Dr. Smith agreed with Dr. Ross on two premises.

Counsel did not read to or summarize for the court the portion of Exhibit 119, a 16-page scholarly article co-authored by Dr. Smith, with which he indicated he would impeach Dr. Smith. Nor as part of the offer of proof did counsel ask Dr. Smith either of the questions that he said he wanted answered. For these reasons, it was impossible to know from the offer of proof how Dr. Smith would have answered the single very general question to be asked of him—whether he agreed with the somewhat self-evident general proposition that the risk of injuries in rear impacts can be ameliorated or made better by bracing or maintaining the head and neck. Nor was it possible to know from the offer of proof whether Dr. Smith's answer would have been inconsistent with Exhibit 119, thereby allowing the statements that remained unspecified at that point to come into evidence as prior inconsistent statements, as the Moores evidently hoped would occur.

 While offers of proof may be adequate if given in narrative form, they must be sufficient to allow the court to make an informed ruling. Here, the offer failed either to show what Dr. Smith would have answered or to draw the court's attention to the parts of the article in question. For these reasons, the trial court had no basis on which it could have determined whether the article would have served as impeachment for whatever answer Dr. Smith might have given. *Karashin v. Haggard Hauling & Rigging, Inc.*, 653 S.W.2d 203, 205 (Mo. banc 1983) ("An offer of proof must demonstrate the relevancy of the testimony offered, must be specific, and must be definite").

 Moreover, even were the offer of proof marginally adequate, Missouri law is well-settled that when the trial court gives the wrong reason for its ruling, the "trial court's action will be upheld if there is any recognized ground on which the trial judge could have rejected the evidence." *Missouri Farmers Ass'n v. Kempker*, 726 S.W.2d 723, 726 (Mo. banc 1987). "The court is vested with broad discretion in ruling [on] questions of relevancy of evidence and, absent a clear showing of abuse of that discretion, the appellate court should not interfere with the trial court's ruling." *State v. Olson*, 854 S.W.2d 14, 16 (Mo.App.1993). The trial court does not err in limiting cross-examination to matters relevant to the case. *Gardner*, 8 S.W.3d at 72 ("cross-examination may not encompass incompetent, irrelevant, or immaterial matters").

 These principles apply directly here; in this instance, the court did not abuse its discretion in prohibiting this question of Dr. Smith. On appeal, the Moores have directed this Court to the portion of Exhibit 119 that they say they would have used to impeach Dr. Smith *if* he had answered their question and *if* he had denied that bracing a neck will ameliorate the injuries the neck suffers as opposed to not bracing the neck. In particular, the two sentences at issue from Dr. Smith's article state:

Injury potential as a function of impact severity can be ameliorated when the head is perfectly braced against relative rearward motion. This notion is supported by tolerance studies involving voluntary human exposure to rear impact (with the head restrained) that reached levels of 28 to 42g.

The Court disagrees with the Moores' suggestion that these two sentences go "to the very heart of the dispute in seat back failure cases where plaintiffs like Jeanne and Monty argue in favor of stronger seats" and that "Dr. Smith's conclusion in his paper—properly supporting the body in rear impacts can ameliorate serious injuries in rear impact collisions—supports the entire causation theme of appellant's case." This argument stretches the relevance of these sentences from Dr. Smith's article beyond their breaking point, and the trial court would have been well within its discretion to find these questions not legally relevant. *State v. Anderson*, 76 S.W.3d 275, 276 (Mo. banc 2002) ("Legal relevance weighs the probative value of the evidence against its costs-unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness").

The sentences in the article, as well as the single question actually asked of Dr. Smith, do not address whether stronger Explorer seats would be safer than those designed by Ford. They do not address at all seat design or injuries from seat design. When read in context, the passage from the article refers to the self-evident fact that keeping the head braced may have ameliorative effects on neck strain in accidents. While logically indisputable, this at best has marginal relevance to the design issue in the case: whether a more rigid seat versus a more collapsible seat was better. Ford did not claim that collapsing seats would not result in more neck strain than perfectly supporting the neck in a rear-end collision, the comment made in Exhibit 119. The answer to the question asked of Dr. Smith and Dr. Smith's statements in Exhibit 119 about perfectly bracing the head to prevent neck strain were of such marginal probative value to whether a rear-yielding seat is safer for the spine that it cannot be said that the trial court abused its discretion in excluding the line of questioning.

## V. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN OVERRULING OBJECTIONS TO ROGER BURNETT'S EXPERT TESTIMONY

After the court directed a verdict on the failure to warn issues, the Moores dismissed their negligent design claim. The only theory remaining in the case for submission to the jury was strict liability for design defect. As noted earlier, the Moores claimed that the seats' design was defective because it allowed the seats to collapse too easily and that a more rigid design would have been safer and would have prevented the injury. Ford attempted to show that its design was not defective or unreasonably dangerous by showing that its design was more protective of riders in a variety of circumstances than other available designs. As a part of this defense, it called as an expert Roger Burnett.

Mr. Burnett testified concerning comparison tests with the Buick LeSabre and Chevrolet Trailblazer. He said that most manufacturers did seatback testing at a lower change of velocity than Ford, that testing of a BMW 850 seat (a seat stronger than the Ford Explorer's) revealed high neck loads that could be fatal and that the National Highway Traffic Safety Administration decided not to change the safety standard applicable to automotive seat strength despite petitions to do so. Ford offered Mr. Burnett's testimony to rebut the testimony of the Moores' expert, Mr. D'Aulerio.[11] Mr. D'Aulerio testified that

---

11. The trial court also admitted testimony

from another Ford expert, Andrew Levitt, in

the Explorer's seats were defective and unreasonably dangerous and made statements that injected the BMW 850, LeSabre and Trailblazer into the case.

The Moores objected to Mr. Burnett's testimony, but the trial court overruled the objections, finding it impossible to separate their evidence as being relevant to only their dismissed claims, and finding that Ford was entitled to answer the Moores' evidence in its part of the case because the jury would find it confusing why Ford simply did not respond to much of the Moores' evidence. The Moores now claim that this was error and that evidence relevant to how the Explorer was designed as compared with other vehicle designs constituted "state of the art" evidence that was not admissible in defense of their remaining strict liability for design defect theory.

 While not all evidence relevant to defense of a negligent design claim necessarily is relevant to defense of a strict liability design defect claim, *Thompson v. Brown & Williamson Tobacco Corp.*, 207 S.W.3d 76, 107 (Mo.App.2006), the testimony of Mr. Burnett to which the Moores now object was relevant to refute the Moores' claim that Ford's design was defective because seats stronger than those of the Explorer were safer. A party " 'may introduce evidence to rebut that of his or her adversary, and for this purpose any competent evidence to explain, repel, counteract, or disprove the adversary's proof is admissible.' " *Scott v. Blue Springs Ford Sales, Inc.*, 215 S.W.3d 145, 164 (Mo.App.2006), *quoting, Govreau v.*

*Nu–Way Concrete Forms, Inc.*, 73 S.W.3d 737, 742 (Mo.App.2002). A court has broad discretion to admit rebuttal evidence, and its exercise of that discretion will be given substantial deference on appeal. *Aliff v. Cody*, 26 S.W.3d 309, 315 (Mo.App.2000).

In the present case, Ford was entitled to present evidence in response to the Moores' claim that the Explorer was defective and unreasonably dangerous. The fact that this evidence of the relative safety of alternative designs may have been most relevant to the negligent design claim that the Moores chose to dismiss does not mean it was not relevant to the Moores' strict liability for design defect claim also. Ford was entitled to present this evidence as part of its defense to the design defect claim.

 Finally, most of the evidence to which the Moores now object largely was cumulative to the evidence they admitted. On direct examination, Mr. D'Aulerio identified the BMW 850 as a car with seats stronger than the Explorer and summarized test results via a chart that specifically identified the Trailblazer and LeSabre by name. As to Mr. Burnett's testimony that Ford's design testing of seats was more demanding than tests conducted by other manufacturers, this testimony was elicited during Ford's case only after Mr. D'Aulerio testified during the Moores' case-in-chief that the Explorer's seats were stronger than most of the seats on the market and that the general consensus in the industry favored yielding seats.[12] "A party cannot be prejudiced by

which Mr. Levitt described testing certain Buick and Volvo seats. But these tests were probative of Ford's design defect defense because Mr. Levitt testified that his testing showed the strong seat caused high neck loads, a "negative byproduct" of a rigid seat design.

12. Any error in allowing Mr. Burnett to testify as to the national safety administration's standards was cured by a limiting instruction, requested by the Moores, that stated that in "determining whether the Ford Explorer was unreasonably dangerous when put to a reasonably anticipated use ... you are not to

the admission of allegedly inadmissible evidence if the challenged evidence is merely cumulative to other evidence admitted without objection." *In re Estate of Looney,* 975 S.W.2d 508, 514–15 (Mo.App. 1998); *Tryon v. McElyea,* 912 S.W.2d 73, 78 (Mo.App.1995). *See also City of Rolla v. Armaly,* 985 S.W.2d 419, 424 (Mo.App. 1999); *Howe v. ALD Servs., Inc.,* 941 S.W.2d 645, 655 (Mo.App.1997).

## VI. NO ERROR IN ADMITTING TESTIMONY FROM FORD'S EXPERT WITNESS, DR. CATHERINE CORRIGAN

█ Next, the Moores claim that the trial court erred in admitting testimony from Ford's expert witness Dr. Catherine Corrigan. The Moores contend that Dr. Corrigan was not qualified to offer the opinions she gave because she is not a medical doctor. To qualify as an expert witness, a person must have specialized knowledge, skill, experience, training, or education within a given profession or calling. *§ 490.065.*

Dr. Corrigan, who holds a Ph.D. in medical engineering and a master's degree in mechanical engineering, offered her expert testimony about the direction, magnitude and effect of forces acting on a person's body in an accident. Dr. Corrigan did not offer testimony concerning Ms. Moore's diagnosis or treatment of injuries. She never testified as a medical diagnostician.

Dr. Corrigan's testimony was limited to her expertise as a biomechanical engineer. A review of the record shows that Dr. Corrigan gave her expert opinion about the direction of the forces that would create a T9–T10 dislocation in the area of the body where Ms. Moore sustained her injuries. Dr. Corrigan testified about the forces using biomechanical engineering terms such as hyperflexion, hyperextension and compression rather than solely medical terminology. Dr. Corrigan did not testify as a medical expert about the cause and diagnoses of Ms. Moore's injuries. Therefore, the court did not err in admitting her testimony.[13]

## VII. CONCLUSION

For the reasons set out above, the directed verdict for Ford on the Moores' negligent and strict liability failure to warn claims is reversed. In all other respects, the judgment is affirmed. The cause is remanded.

TEITELMAN, WOLFF and BRECKENRIDGE, JJ., concur.

PRICE, C.J., dissents in separate opinion filed.

FISCHER, J., concurs in opinion of PRICE, C.J.

RUSSELL, J., not participating.

---

consider any evidence that the driver's seat and related component parts of the Ford Explorer complied with any of the Federal Motor Vehicle Safety Standards." *Alberswerth v. Alberswerth,* 184 S.W.3d 81, 100 (Mo.App. 2006) ("an error in the admission or exclusion of evidence will only result in reversal if the appellant was prejudiced by it"); *Scott v. Blue Springs Ford Sales, Inc.,* 215 S.W.3d 145, 164–65 (Mo.App.2006). Prejudice occurs only if an error affects the result or the outcome of the case. *Id.* The Moores fail to show how any error was outcome-determinative or why the withdrawal instruction was not sufficient to cure any error.

13. In their final point, the Moores argue that even if none of the alleged evidentiary errors just discussed in regard to their design defect claim are prejudicial in themselves, the cumulative effect of these errors requires that all claims be retried. As multiple evidentiary errors in admitting evidence regarding the design defect claim have not been found, however, this point is moot.

WILLIAM RAY PRICE, JR., Chief Justice.

In this case a six foot tall, three hundred pound woman, Ms. Moore, was driving a 2002 Ford Explorer. The Ford was struck from behind by another vehicle, causing Ms. Moore's seat to collapse backward, despite the seat being one of the more secure in the industry. The collapse resulted in the fracture of Ms. Moore's T9 vertebra.

At trial, Ford was granted a directed verdict on the Moores' failure to warn claims. The only remaining claim, strict liability for design defect, was submitted to the jury. The jury returned with a finding that the seat was not defectively designed.

Notwithstanding the failure of the plaintiffs to offer any evidence of a feasible, adequate warning that would have avoided the injury, the majority reverses the trial court's directed verdict ruling. I respectfully dissent and would affirm the trial courts ruling with respect to the failure to warn claims.

To establish a cause of action in Missouri for strict liability or negligent failure to warn plaintiffs must prove, among other things, that "defendant did not give adequate warning of the danger" and that plaintiff was "damaged as a direct result of the product being sold without an adequate warning." *Tune v. Synergy Gas Corp.*, 883 S.W.2d 10, 13 (Mo. banc 1994); MAI 25.09. The Moores, however, offered no evidence of what the "adequate warning" should have been and, thus, failed to prove what is required.

To assist the Moores in making their case, the majority invokes the "heeding presumption," announced in *Duke v. Gulf & W. Mfg. Co.*, 660 S.W.2d 404, 419 (Mo. App.1983) and *Arnold v. Ingersoll–Rand Co.*, 834 S.W.2d 192, 194 (Mo. banc 1992). The "heeding presumption" assumes that

had an adequate warning been given, it would have been heeded. *Id.* This presumption, however, does not establish that a warning was required or what an "adequate warning" would have been. "[T]he most the presumption does is establish that a warning would have been read and obeyed." *Kovach v. Caligor Midwest*, 913 N.E.2d 193, 199 (Ind.2009).

Missouri adopted the heeding presumption from Indiana in *Duke*, 660 S.W.2d at 418, specifically stating "[a]s to the sufficiency of evidence whether Mr. Duke would have heeded a warning not to operate the press without a guard, we would agree with the court in *Craven v. Niagara Mach. & Tool Works, Inc.*, 417 N.E.2d 1165, 1171 (Ind.App.1981), that a rebuttable presumption must arise that a warning would be heeded." Having adopted the "heeding presumption" from Indiana, Missouri should follow the additional evidentiary requirements imposed by Indiana with respect to failure to warn claims.

To make a submissible failure to warn case in Indiana, a plaintiff must offer some evidence of the content or placement of a warning that would have prevented the danger posed by the product in question. *Nissen Trampoline Co. v. Terre Haute First Nat'l Bank*, 265 Ind. 457, 358 N.E.2d 974, 978 (1976); *Morgen v. Ford Motor Co.*, 797 N.E.2d 1146, 1152 (Ind.2003). Such evidence is "indispensable to a rational conclusion that the product was defective and unreasonably dangerous to the user without warnings, and to a rational conclusion that such unreasonably dangerous condition was the proximate cause of the accident and injury." *Nissen Trampoline*, 358 N.E.2d at 978. Failure to offer evidence of this nature imposes upon courts the onerous duty of hypothesizing warnings that would alter a plaintiff's behavior or, as is the case here, they may

choose to ignore the inquiry altogether. *Id.*

Other jurisdictions also require plaintiffs to offer evidence as to what specific warnings would have been sufficient to avoid injury in order to establish a prima facie case for failure to warn. DAVID G. OWEN ET AL., MADDEN & OWEN ON PRODUCTS LIABILITY 586 (West Group, 3rd Ed.2000) ("Plaintiff should not prevail in a warnings suit if the record is bereft of evidence as to what type of warning might have prevented the accident"); *Coleman v. Chesebro–Whitman Co.,* 262 A.D.2d 265, 690 N.Y.S.2d 729 (1999) (where Appellate Division of the Supreme Court of New York affirmed summary judgment dismissing a cause of action for strict liability based on failure to warn because "plaintiffs failed to allege what the labels would have warned against and in what way the lack of such warnings was proximate cause of the accident"); *see also Meyerhoff v. Michelin Tire Co.,* 852 F.Supp. 933, 947–948 (D.Kan.1994) (plaintiff must not only propose a warning, but "establish that warning's feasibility, adequacy, and effectiveness"); *Pelman v. McDonald's Corp.,* 237 F.Supp.2d 512, 540 (S.D.N.Y.2003) (standard for failure to warn liability includes such issues as "feasibility and difficulty of issuing warnings in the circumstances"); *Downing v. Overhead Door Corp.,* 707 P.2d 1027, 1033 (Colo.App. 1985) (warning must be feasible to establish strict liability for failure to warn); *Oxford v. Foster Wheeler LLC,* 177 Cal. App.4th 700, 717, 99 Cal.Rptr.3d 418 (2009) (whether the absence of a warning makes a product defective involves several factors, including "the feasibility and beneficial effect of including such a warning"). To require anything less invites not only a roving jury instruction, but the danger of subjecting a manufacturer to liability for failing to do the impossible.

The majority makes a leap by presuming that an adequate warning would have been heeded, without any evidence of what that adequate warning would have been or whether it was even feasible to construct one. The Court need look no further than the instant case to see the folly invited by the majority's extension of the "heeding presumption." Despite the fact that the seat in question was one of the safest in the industry, the Moores argue that when people of a particular size are traveling at a particular speed the seat may fail. Thus, a hypothetical warning, as to the likelihood that the seats might collapse, must be in the form of a sliding-scale, varying among a myriad of factors, including weight of occupants, height of occupants and the velocity of impact. Tellingly, the Moores failed to offer any evidence as to the wording of this problematic warning, its feasibility or where it might have been placed.

While it is true that *Duke* and its progeny make no reference to a requirement that a plaintiff specifically plead an adequate warning, those cases involved relatively simple, common sense warnings that are a far cry from the complex calculations required here. *See Duke,* 660 S.W.2d 404 (operating power press without a guard); *Arnold,* 834 S.W.2d 192 (exposing air compressor's electrical switch to gas fumes); *Tune,* 883 S.W.2d 10 (propane tank overfilled).

Because the Moores failed to offer any evidence as to what a feasible, adequate warning might say or where it might be placed, they did not make a submissible case. At least some evidence of a feasible, adequate warning should be required before application of the "heeding presumption."